1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    ROBERT A. DALY,                          Case No.  24-cv-00242-EMC

8                 Plaintiff,

9          v.                                 **ORDER GRANTING IN PART AND
                                              DENYING IN PART DEFENDANT'S
10   FEDERAL DEPOSIT INSURANCE                MOTION TO DISMISS**
     CORPORATION,
11                                            Docket No. 36
                 Defendant.

12

13

14          Plaintiff Robert A. Daly, Jr. has filed suit against the Federal Deposit Insurance

15   Corporation ("FDIC"), as receiver for First Republic Bank ("Bank").  Mr. Daly previously worked

16   for the Bank.[1]  According to Mr. Daly, the Bank fraudulently induced him to accept employment

17   "mere weeks before [it] failed."  Compl. ¶ 1.  Now pending before the Court is the FDIC's motion

18   to dismiss.  Having considered the parties' briefs as well as the oral argument of counsel, the

19   Court hereby **GRANTS** in part and **DENIES** in part the motion to dismiss.

20          **I.        FACTUAL & PROCEDURAL BACKGROUND**

21          In his complaint, Mr. Daly alleges as follows.

22          Mr. Daly is a financial adviser.  *See* Compl. ¶ 11.  In late 2022, the Bank began to recruit

23   him.[2]  *See* Compl. ¶ 12.

24   _____

25   [1] In his complaint, Mr. Daly suggests he was an employee of the Bank.  *See* Compl. ¶ 1.
     However, the FDIC asserts that he was an independent contractor.  *See* Mot. at 15; Barter Decl.,
26   Ex. A (Promoter Agreement entered into between First Republic Investment Management, Inc. (a
     Bank affiliate) and Mr. Daly) (referring to Mr. Daly as a consultant and independent contractor).

27
     [2] The FDIC, as noted above, asserts that Mr. Daly was not an employee of the Bank but rather
28   simply an independent contractor.  The FDIC has provided a copy of a Promoter Agreement that
     was entered into by the Bank (or rather, an affiliate thereof) and Mr. Daly.  The Promoter

United States District Court
Northern District of California

Through its senior executives, the Bank made misrepresentations to Mr. Daly to induce him to accept employment.  Implicitly, these misrepresentations were made during the recruitment process given that they were made to induce Mr. Daley to accept employment.  For example, they

> (a) repeatedly tout[ed] the Bank's safe business model, assuring investors and prospective employees that it was strongly-positioned to weather a variety of economic conditions; (b) contend[ed] that the Bank had a robust lending platform, referral network, and an attractive payout for cash balances; and (c) contend[ed] that the Bank had competitive home mortgage rates and it would be aggressive in winning any mortgage business.

Compl. ¶ 27.

These representations were false.

- For instance, when Mr. Daly presented the Bank with a customer who was interested in a $95 million loan, the Bank said it was not funding large loans any longer.  *See* Compl. ¶ 17; *see also* Opp'n at 9 (asserting that, "during recruitment Mr. Daly discussed a customer interested in a $95 million loan" and "[t]he Bank

_____

Agreement describes the relationship between the Bank affiliate and Mr. Daly as follows:

> 1. **Solicitation of Clients.**  As a consultant and independent contractor, and not as an employee of Adviser [the Bank affiliate], Promoter [Mr. Daly] will use its best efforts, in accordance with this Agreement, to solicit and refer as clients to Adviser those individuals or entities that it believes are suitable and appropriate for the investment advisory services provided by Adviser and/or insurance services provided by Adviser's affiliate.
>
> 2. **Client Relationships.**  Promoter's primary role under this Agreement is to introduce and assist each Solicited Client in establishing a relationship with Adviser, which will include introducing prospective clients and providing information about Adviser.

Barter Decl., Ex. A (Promoter Agreement ¶¶ 1-2).

Mr. Daly would be compensated "for each Solicited Client that enters into and maintains an investment management agreement with Adviser," specifically, "20% of the gross earned and collected investment advisory fees actually received by Adviser for each Solicited Client."  Barter Decl., Ex. A (Promoter Agreement ¶ 6).  In addition, "[f]or each Solicited Client that enters into and purchases an insurance contract with Adviser's insurance affiliate," Mr. Daly would be "entitled to receive from the applicable insurance carrier, as the solely responsible payor, a 10% gross-dollar commission earned and vested on each insurance contract that Adviser's affiliate and Promoter mutually agree will be written for Solicited Clients."  Barter Decl., Ex. A (Promoter Agreement ¶ 6).

2

had represented to Mr. Daly that [it] was interested in funding the customer's loan, and would be ultra-competitive in winning the business").

- Also, when Mr. Daly brought a potential $18 million mortgage to the Bank, the Bank effectively ensured that the business would not be won by "quot[ing] the client a mortgage rate 300 bps higher than the market rate."  Compl. ¶ 18.

- Finally, less than two weeks after Mr. Daly accepted employment, the S&P Global Ratings "downgraded the Bank's long-term issuer credit rating and preferred stock issue rating due to risks of deposit outflows leading to increased funding costs."  Compl. ¶ 19.  Fitch Ratings also downgraded the Bank's credit rating on the same day, "observing that '[the Bank's] funding and liquidity profile has changed and represents a "weakest link."'"  Compl. ¶ 19.  The market responded to the downgrades, with the Bank's common stock dropping from $39.63 per share on March 14, 2023, to $31.16 per share on March 15, 2023.  *See* Compl. ¶ 20.  The stock continued to decline thereafter.  *See* Compl. ¶ 20.

To induce Mr. Daly to accept employment, the Bank also concealed information, including "the risks that rising interest rates posed to the Bank's net interest income and net interest margin and the value of the Bank's mortgage loan portfolio."  Compl. ¶ 36.  The Bank also downplayed these risks publicly.  *See* Compl. ¶ 9; *see also* Compl. ¶ 10 (alleging that, "in SEC filings and multiple public statements, the Bank misrepresented the strength of its balance sheet, liquidity and position in the market").  "[T]he Bank understated and concealed the magnitude of the risks facing its business model that would result from any decision by the Federal Reserve System raising the federal funds rate, thereby undermining the value of the Bank's loan and securities portfolios and liquidity."  Compl. ¶ 10.

As a result of (1) the misrepresentations and (2) the omission of material facts, Mr. Daly joined the Bank on March 3, 2023.  *See* Compl. ¶ 16.  But, as noted above, less than two weeks after Mr. Daly joined, the S&P Global Ratings and Fitch Ratings downgraded, *inter alia*, the Bank's credit rating which led to a decline in the value of the Bank's stock.

On April 28, 2023, reports came out that the Bank would likely enter into a receivership

1    with the FDIC.  The Bank's common stock dropped again, this time from $6.19 per share on April

2    27, 2023, to $3.51 per share on April 28, 2023.  *See* Compl. ¶ 22.

3         On May 1, 2023, the FDIC became the receiver for the Bank, and JPMorgan Chase took

4    over the Bank.[3]  *See* Compl. ¶¶ 2, 23.

5         On May 2, 2023, the NYSE announced that it was suspending trading in the Bank's shares

6    and started proceedings to delist the shares.  *See* Compl. ¶ 23.  Mr. Daly resigned from the Bank

7    that day.  *See* Compl. ¶ 24.

8         "From the time Mr. Daly joined the Bank on March 3, 2023, until the Bank was seized by

9    the FDIC on May 1, 2023, the Bank continued to falsely represent to Mr. Daly that the Bank was

10   not going to go into receivership and that Mr. Daly would be foolish to leave."  Compl. ¶ 25.

11        After the FDIC became the receiver, Mr. Daly filed a proof of claim with the agency

12   "pursuant to the procedures provided in the Financial Institutions Reform and Recovery and

13   Enforcement Act ('FIRREA')."  Compl. ¶ 7.  On November 16, 2023, the FDIC disallowed the

14   claim.  *See* Compl. ¶ 7.  Mr. Daly then initiated this lawsuit on January 12, 2024.

15        Based on, *inter alia*, the above allegations, Mr. Daly has asserted the following causes of

16   action:

17        (1) Intentional misrepresentation.

18        (2) Fraudulent concealment.

19        (3) Negligent misrepresentation.

20        (4) Promissory fraud.

21        (5) Intentional interference with prospective economic advantage.

22        (6) Negligent interference with prospective economic advantage.

23

24   _____

     [3] In its motion, the FDIC represents that it was the California Commissioner of Financial
25   Protection and Innovation that closed the Bank, which then led to the FDIC being appointed as
     receiver.  *See* Mot. at 1; Purcell Decl. ¶ 2 & Ex. A (California Department of Financial Protection
26   and Innovation order of liquidation, order taking possession of property and business, and
     appointment and tender of appointment as receiver).
27
          The FDIC also represents that JPMorgan assumed the deposits and substantially all of the
28   Bank's assets pursuant to a Purchase and Assumption Agreement with the FDIC; the FDIC
     retained the liabilities for any alleged misconduct of the Bank.  *See* Mot. at 2.

1    (7) Unfair, illegal, and fraudulent acts in violation of California Business &

2         Professions Code § 17200.

3    The claims essentially fall into two categories: (1) fraud claims and (2) interference claims.  The §

4    17200 claim is a derivative claim.

5    ## II.    DISCUSSION[4]

6    A.    Legal Standard

7         Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

8    statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

9    complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

10   Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss

11   after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic*

12   *Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must .

13   . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d

14   1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and

15   construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St.*

16   *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a

17   complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient

18   allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

19   effectively."  *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).   "A claim has facial

20   plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

21   inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The

22   plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

23   possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).

24

25   _____

26   [4] In its reply brief, the FDIC argues that the Court should disregard Mr. Daly's opposition because
     it is "technically defective."  Reply at 9.  This argument lacks merit.  According to the FDIC, Mr.
27   Daly was permitted to file a 20-page brief only.  But the Civil Local Rules allow for a 25-page
     opposition.  *See* Civ. L.R. 7-3(a).  The authority that the FDIC cites is a rule that applies to circuit
28   courts only.  *See* Fed. R. App. P. 27(d)(2) (addressing motions filed in conjunction with an
     appeal).

B.      *D'Oench* and §§ 1823(e) and 1821(d)(9)(A)

The FDIC argues first that all of Mr. Daly's tort claims are barred by a Supreme Court case

and two related statutes.  The Supreme Court case is *D'Oench, Duhme & Co., Inc. v. FDIC*, 315

U.S. 447 (1942).  The related statutes are 12 U.S.C. §§ 1823(e) and 1821(d)(9)(A).  The two

statutes are essentially based on *D'Oench*.

1.      *D'Oench*

Because the statutes are essentially predicated on *D'Oench*, the Court begins with a review

of that case.  In *D'Oench*,

> the Supreme Court created a federal common law doctrine of
> estoppel *to protect the FDIC from defenses raised by debtors* based
> on "secret agreements" with failed banks.  *D'Oench* involved a
> securities dealer who sold a bank some bonds which later became
> worthless.  To prevent the past due bonds from appearing among the
> assets of the bank, the dealer executed a demand note with the bank
> *and* entered into a separate agreement with the bank that the note
> would not be called for payment.  The FDIC later acquired the note
> in a purchase and assumption transaction. When the FDIC
> demanded payment on the note, the maker defended on the basis of
> the side agreement with the bank, in which the bank promised not to
> call the note for payment.  The lower courts applied Illinois state law
> and held that the FDIC was entitled to recover on the note as a
> "holder in due course."
>
> The Supreme Court rejected the lower courts' use of state law and
> instead created a federal common law rule by drawing an analogy to
> provisions of the Federal Reserve Act, which "revealed a federal
> policy to protect [the FDIC] and the public funds which it
> administers against misrepresentations as to the securities or other
> assets in the portfolios of the banks which [the FDIC] insures or to
> which it makes loans."  The Court held that a *"secret agreement"
> outside the documents contained in the bank's records would not
> operate as a defense against a suit by the FDIC on the note*. . . .
> [T]he Court added that the maker of the note did not have to intend
> to deceive anyone; it was sufficient "that the maker lent himself to a
> scheme or arrangement whereby the banking authority . . . was
> likely to be misled."

*Motorcity of Jacksonville v. Southeast Bank, N.A.*, 83 F.3d 1317, 1324 (11th Cir. 1996) (emphasis

added), *vacated and remanded for further consideration*, 519 U.S. 1087 (1997), *and then

reinstated*, 120 F.3d 1140 (11th Cir. 1997); *see also FDIC v. Craft*, 157 F.3d 697, 705 (9th Cir.

1998) (stating that the *D'Oench* doctrine "protects the FDIC from unwritten agreements that

relieve a debtor of the obligation to repay a facially unconditional note").

2.    Section 1823(e)

> Eight years after *D'Oench*, Congress passed The Federal Deposit Insurance Act of 1950, which broadened *D'Oench*'s protection of the FDIC.  Section 1823(e) imposes various requirements on "any agreement which tends to diminish or defeat the interest" of the FDIC in any asset acquired from an insolvent bank.  An agreement – that "tends to diminish or defeat" the FDIC's interest in an asset – is only valid against the FDIC if it, *inter alia*, is in writing, is continuously an official record of the failed bank, is executed by the bank itself, and satisfies other approval and filing requirements in § 1823(e).

*Landscastle Acquisition Corp. v. Renasant Bank*, 57 F.4th 1203, 1213 (11th Cir. 2023).

The relevant text of § 1823(e) is provided below:

> No *agreement* which tends to diminish or defeat the interest of the Corporation [*i.e.*, the FDIC] in any *asset* acquired by it under this section or section 11 [12 U.S.C. § 1821], either as security for a loan or by purchase *or* as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement –
>
> (A)   is in writing,
> (B)   was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
> (C)   was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
> (D)   has been, continuously, from the time of its execution, an official record of the depository institution.

*Id.* § 1823(e)(1) (emphasis added).

The Supreme Court has underscored that one of § 1823(e)'s purposes

> is to allow federal and state bank examiners to *rely on a bank's records in evaluating the worth of the bank's assets*.  Such evaluations are necessary when a bank is examined for fiscal soundness by state or federal authorities and when the FDIC is deciding whether to liquidate a failed bank or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank.  The last kind of evaluation, in particular, must be made "with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services."  *Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.*

*Langley v. FDIC*, 484 U.S. 86, 91-92 (1987) (emphasis added).

3.      Section 1821(d)(9)(A)

Subsequently, Congress enacted the Financial Institution Reform, Recovery and Enforcement Act ("FIRREA") of 1989.  With the enactment of FIRREA, Congress "extend[ed] § 1823(e)(1)'s protections to *affirmative claims against the FDIC*."  *Commercial Law Corp., P.C. v. FDIC*, 777 F.3d 324, 329 (6th Cir. 2015) (emphasis added).  In particular, § 1821(d)(9)(A) provides in relevant part as follows: "any agreement which does not meet the requirements set forth in section 13(e) [§ 1823(e)] shall not form the basis of, or substantially comprise, a claim against the receiver or the Corporation [FDIC]."  12 U.S.C. § 1821(d)(9)(A); *see also Commercial Law*, 777 F.3d at 326 (noting that § 1823(e) & § 1821(d)(9)(A) "impose documentation requirements for bank agreements" and "derive from the common-law *D'Oench* doctrine, an estoppel rule akin to a statute of frauds that shields the FDIC from claims and defenses based on unwritten agreements that reduce bank assets").

4.      "Agreement"

Although *D'Oench* and the two statutes above all refer to an "agreement" made with a bank, courts have interpreted the term "agreement" somewhat loosely as demonstrated by the Supreme Court's decision in *Langley*.

There, the Langleys borrowed money from a bank that was insured by the FDIC in order to buy certain real property.  In consideration for the loan, the Langleys executed a promissory note.  After they failed to make a payment, the bank filed suit against them.  The Langleys removed the case to federal court where it was consolidated with a case that they had brought against the Bank.

> The Langleys alleged as one of the grounds of complaint in their own suit, and as a defense against [the bank's] claim [against them], that the 1980 land purchase and the notes had been procured by misrepresentations.  *In particular, they alleged that the notes had been procured by the bank's misrepresentations* that the property conveyed in the land purchase consisted of 1,628.4 acres, when in fact it consisted of only 1,522, that the property included 400 mineral acres, when in fact it contained only 75, and that there were no outstanding mineral leases on the property, when in fact there were.  No reference to these representations appears in the documents executed by the Langleys, in the bank's records, or in the minutes of the bank's board of directors or loan committee.

*Langley*, 484 U.S. at 88-89 (emphasis added).

United States District Court
Northern District of California

8

The FDIC was substituted in for the bank with respect to the claim that the bank had brought against the Langleys. The issue for the Supreme Court was whether, "in an action brought by the FDIC in its corporate capacity for payment of a note, § 1823(e) bars the defense that *the note was procured by fraud in the inducement* even when the fraud did not take the form of an express promise." *Id.* at 90 (emphasis added).

The Supreme Court rejected the Langleys' contention that the term "agreement" as used in § 1823(e) "encompasses only an express promise to perform an act in the future." *Id.* It reasoned as follows.

First,

> [a]s a matter of contractual analysis, the essence of petitioners' defense against the note is that the bank made certain warranties regarding the land, the truthfulness of which was a condition to performance of their obligation to repay the loan. As used in commercial and contract law, the term "agreement" often has "a wider meaning than . . . promise," and embraces such a condition upon performance.

*Id.* at 90-91.

Second, a definition of "agreement" along these more expansive lines was warranted in order for the "intended purposes" of § 1823(e) to be fulfilled. *See id.* at 91-92 (noting, *e.g.*, that "[n]either the FDIC nor state banking authorities would be able to make reliable evaluations if bank records containing seemingly unqualified notes that are in fact subject to undisclosed conditions").

Third, the *D'Oench* case confirmed that an "agreement" for purposes of § 1823(e) "covers more than promises to perform acts in the future." *Id.* at 92.

> The [*D'Oench*] Court held that [a] "secret agreement" could not be a defense to suit by the FDIC because it would tend to deceive the banking authorities. The Court stated that when the maker "lent himself to a *scheme or arrangement* whereby the banking authority . . . was likely to be misled," that scheme or arrangement could not be the basis for a defense against the FDIC. We can safely assume that Congress did not mean "agreement" in § 1823(e) to be interpreted so much more narrowly than its permissible meaning as to disserve the principle of the leading case applying that term to FDIC-acquired notes. Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authorities, whether the condition

consists of performance of a counterpromise (as in *D'Oench, Duhme*) or of the truthfulness of a warranted fact.

*Id.* at 92-93 (emphasis in original).

Accordingly, under *Langley*, a defense that a bank *fraudulently induced* the debtor to take out a promissory note, now held by the FDIC, is barred. *See Brookside Associates v. Rifkin*, 49 F.3d 490, 494 (9th Cir. 1995) (stating that, under *Langley*, "unrecorded conditions on a note that consisted of the truthfulness of a warranted fact (the bank's representations as to the size and other conditions of the property) were an arrangement likely to mislead the banking authorities,  and thus could not be asserted against the FDIC"); *Federal Deposit Ins. Corp. v. Kratz*, 898 F.2d 669, 671 (8th Cir. 1990) (stating that "12 U.S.C. § 1823(e) precludes the defense of fraud in the inducement unless the representation was in writing, contemporaneously made with the guaranty, approved by the bank's board of directors, and made part of the bank's records continuously since the guaranty was made").

Although *Langley* addressed the situation where a *defense* of fraudulent inducement is raised by a debtor, there is no reason to think that the same reasoning would not also apply where an *affirmative claim* of fraudulent inducement is asserted by a debtor – particularly in light of § 1821(d)(9)(A) which covers affirmative claims made against the FDIC.

5.    Fraudulent Inducement of Employment Contract

The FDIC argues first that both Mr. Daly's fraud claims and his interference claims are barred pursuant to the *D'Oench* doctrine and statutes discussed above – *i.e.*, his claims are affirmative claims against the FDIC for fraudulent inducement.  The problem for the FDIC is that it has not established that the *D'Oench* doctrine and statutes discussed above apply in the employment context specifically.  As indicated above, both *D'Oench* and § 1823(e) (as informed by the Supreme Court's decision in *Langley*) are predicated on the expectation that banking transactions are typically expected to be reflected in the bank's records – *i.e.*, to insure there are no secret agreements which would impair the accuracy of those bank records as might be determined by bank examiners.  The FDIC does not explain why that expectation should be imported beyond the context of bank assets (such as promissory notes) into the employment context.

In fact, several courts have specifically rejected application of *D'Oench* and/or the statutes

at issue outside of the context of normal banking transactions.  For example, the Eleventh Circuit

has stated that *D'Oench* does not bar all tort claims against the FDIC:

> Rather, the key inquiry is one of relatedness.  This requirement demands that a tort be sufficiently intertwined with regular banking transactions, such that exclusion of the alleged 'secret agreement' accords with the underlying policies of *D'Oench*.
>
> One obvious indicia of relatedness would be whether the oral representations were of matters that would generally be reflected in the records of ordinary banking transactions.  This reflects the central purpose of *D'Oench*: bank examiners should be permitted to rely upon the institution's records of regular banking transactions.  For example, in *Langley*, the Supreme Court applied section 1823(e) to bar a claim based upon an oral misrepresentation, notwithstanding the fact that the claim sounded in tort.  The alleged fraudulent misrepresentations in *Langley* occurred during negotiation of a loan.

*Geri Zahn, Inc. v. Govaert*, 25 F.3d 1539, 1543-44 (11th Cir. 1994).  Bank examiners looking at

bank records would typically not look at every employment contract entered into by the bank.

As another example, a district court in Florida expressly noted that:

> [w]e have found no case applying section 1823(e) to an *employment contract*; indeed, the very language of 1823(e)(3) contemplates a *financial transaction of some sort*, requiring that a loan committee or the board of directors approve the obligation sought to be enforced against the entity, and that the approval be reflected in the corporate minutes.  *See Vernon*, 907 F.2d at 1107 ("In every *D'Oench* doctrine case save one, the FDIC, the FSLIC or some successor in interest asserted or defended the validity and enforceability of a particular debt or monetary obligation owed to a failed bank . . ."); *North Arkansas Medical Center*, 962 F.2d 780 (8th Cir. 1992) (noting that few cases have extended *D'Oench* and § 1823(e) beyond creditor-debtor transactions).

*Bender v. CenTrust Mortgage Corp.*, 833 F. Supp. 1525, 1531-32 (S.D. Fla. 1992) (emphasis

added); *see also Fleischer v. Resolution Trust Corp.*, 882 F. Supp. 999, 1009 (D. Kan. 1995)

(stating that "the court is aware of no case in which § 1823(e) has been used to defeat an

employee's claim to recover pursuant to an association's written employment policy").

These cases are persuasive, and the FDIC has cited no cases to the contrary.  The Court

therefore rejects the FDIC's position that *D'Oench* and the above statutes are a bar to Mr. Daly's

United States District Court
Northern District of California

11

1   employment-related claims.[5]

2   C.      Failure to State a Claim for Relief

3           The FDIC argues that, even if *D'Oench* and the above statutes do not bar Mr. Daly's

4   claims, his claims still lack merit based on failure to state a claim for relief.

5           1.      Director and Officer Misconduct

6           The FDIC's first argument on failure to state a claim for relief is confusing.  The agency

7   contends that:

8       •   Mr. Daly's claims are based on director and officer ("D&O") misconduct at the

9           Bank;

10      •   the FDIC, as receiver, is the successor to any D&O claims when a bank fails; and

11      •   "[b]ecause [the FDIC] succeeds to D&O claims, [Mr.] Daly is prohibited from

12          attempting to make such allegations."

13  Mot. at 7 (citing 12 U.S.C. §§ 1821(k), 1821(d)(2)(A)).

14          But this argument does not make sense because Mr. Daly is not seeking to hold any officer

15  or director of the Bank *personally liable*.  *See* 12 U.S.C. § 1821(k) (providing that "[a] director or

16  officer of an insured depository institution may be held personally liable for monetary damages in

17  any civil action by, on behalf of, or at the request or direction of the [FDIC], which action is

18  prosecuted wholly or partially for the benefit of the [FDIC] [*e.g.*] acting as conservator or receiver

19  of such institution . . . for gross negligence, including any similar conduct or conduct that

20  demonstrates a greater disregard of a duty of care . . . including intentional tortious conduct").

21  Section 1821(d)(2)(A), the other statute cited by the FDIC, is not on point either.  *See id.* §

22  1821(d)(2)(A) (providing that the FDIC "shall, as conservator or receiver, and by operation of law,

23  succeed to [*e.g.*] all rights, titles, powers, and privileges of the insured depository institution, and

---

[5] Given the Court's ruling above, it need not address additional arguments raised by Mr. Daly in his papers – *e.g.*, that *D'Oench*, § 1823(e), and § 1821(d)(9)(A) apply only where there is a specific asset acquired by the FDIC and that they do not apply simply because payment of a claim by the FDIC will reduce the general assets of the failed bank.  *See* Opp'n at 24, 26-28 (citing, *inter alia*, *Ledo Fin. Corp. v. Summers*, 122 F.3d 825, 830 (9th Cir. 1997) (noting that "§ 1823(e) applies solely to assets and not to agreements pertaining to liabilities of a bank in receivership").

United States District Court
Northern District of California

1    of any stockholder, member, accountholder, depositor, officer, or director of such institution with

2    respect to the institution and the assets of the institution").

3                2.    <u>Fraud and Related Claims</u>

4    As noted above, Mr. Daly's fraud and related claims are as follows:

5    •    Intentional misrepresentation.

6    •    Fraudulent concealment.

7    •    Negligent misrepresentation.

8    •    Promissory fraud.

9    •    Derivative violation of § 17200.

10   For practical purposes, the Court can focus on the first two claims – *i.e.*, intentional

11   misrepresentation and fraudulent concealment.  "The elements of fraud . . . are (a)

12   misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity

13   (or scienter); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting

14   damage."  *Tenet Healthsys. Desert, Inc. v. Blue Cross of Cal.*, 245 Cal. App. 4th 821, 837 (2016)

15   (internal quotation marks omitted).

16   In the case at bar, Mr. Daly charges with the Bank with both misrepresentations and

17   omissions.  For example, as alleged, the Bank's "senior executives"

18           (a) repeatedly tout[ed] the Bank's safe business model, assuring
             investors and prospective employees that it was strongly-positioned
19           to weather a variety of economic conditions; (b) contend[ed] that the
             Bank had a robust lending platform, referral network, and an
20           attractive payout for cash balances; and (c) contend[ed] that the
             Bank had competitive home mortgage rates and it would be
21           aggressive in winning any mortgage business.

22   Compl. ¶ 27; *see also* Compl. ¶¶ 15, 17-18.  Also, the Bank's "senior executives" concealed

23   information such as "the risks that rising interest rates posed to the Bank's net interest income and

24   net interest margin and the value of the Bank's mortgage loan portfolio."  Compl. ¶ 36.  The senior

25   executives are identified in the complaint as: "Mr. Robert Thornton, Head of Private Wealth

26   Management; Mr. Thomas Glamuzina, Vice President, Wealth Management

27   Recruiting; and Mr. Mohammad Fahmi, Head of Lending, West Coast."  Compl. ¶ 13.

28   In its motion, the FDIC's main argument is that the claims are not viable because Mr. Daly

United States District Court
Northern District of California

13

has not alleged how the Bank knew or should have known that, at the time that it recruited Mr. Daly, it was about to fail. In short, there is no scienter. That argument lacks merit. The gist of Mr. Daly's claims is that the Bank was in a precarious financial situation at the time it began to recruit him in late 2022; that senior executives – given their position – would likely be in a position to have knowledge of such; and that it can reasonably be inferred that the Bank was in a precarious financial situation during the relevant time because, within two weeks after Mr. Daly was hired in March 2023, the Bank's credit ratings were downgraded and then, within two months, it was reported that the Bank would be put into a receivership.[6] In other words, the timing lends supports Mr. Daly's contention that the Bank knew it was in a risky position during the process of recruitment during which misrepresentations were made. In the context of the instant motion to dismiss, all reasonable inferences must be drawn in the plaintiff's favor.

At the hearing, the FDIC argued that there is a problem with timing, at least as described in Mr. Daly's complaint. There is an allegation in the complaint that the Bank made representations about its safe business model, ability to weather a variety of economic conditions, and so forth as far back as January 2021. *See* FAC ¶ 9 ("Between January 2021 and May 1, 2023, the Bank and its executives repeatedly touted the Bank's safe business model, assuring investors and prospective employees that it was strongly-positioned to weather a variety of economic conditions. The Bank downplayed the risks that rising interest rates posed to the Bank's net interest income

---

[6] The FDIC has raised a similar argument that is targeted at the promissory fraud claim specifically. In that claim, Mr. Daly alleges, in relevant part, as follows:

> 52. To induce Plaintiff to accept employment at the Bank, the Bank promised Plaintiff, among other things, (a) that the Bank had a robust lending platform, referral network, and an attractive payout for cash balances; and (b) that the Bank had competitive home mortgage rates and it would be aggressive in winning any mortgage business.

> 53. The Bank did not intend to perform these promises when made.

Compl. ¶¶ 52-53. The FDIC contends that the statement made in ¶ 53 is too conclusory – *i.e.*, there are no facts to support the conclusion that the Bank did not intend to perform the promises when made. But this argument is not that compelling given that, as noted above, the gist of Mr. Daly's claim is that the Bank knew it was in a financially precarious position, and thus it can reasonably be inferred that it knew it would not be able to perform the promises identified above.

United States District Court
Northern District of California

and net interest margin and the value of the Bank's mortgage loan portfolio.").  The FDIC

contends that, back in January 2021 – some two years before Mr. Daly was hired – the Bank may

well have, in good faith, believed such representations.  The problem for the FDIC is that Mr.

Daly is not contending that he relied on any representations made in January 2021; rather, his

focus is on representations made during or near the time of his recruitment and thereafter, at least

that is the inference that reasonably may be drawn.  *See, e.g.*, Compl. ¶ 12 ("The Bank began

recruiting Mr. Daly in late 2022.  During the recruitment process, in addition to the public

representations about the Bank's health, the Bank made misrepresentations, and omitted important

facts, regarding the Bank's stability and financial health to induce Mr. Daly to enter into

agreements."); Compl. ¶ 27 ("To induce Plaintiff to accept employment at the Bank, and to

continue employment with the Bank, the Bank . . . made certain representations to Plaintiffs,

including, among other things, (a) repeatedly touting the Bank's safe business model, [etc.].").

Thus, contrary to what the FDIC contends, the timing does not preclude scienter, at least for

purposes of the instant motion.  This is, of course, without prejudice to examining the Bank's

knowledge and scienter with respect to the alleged misrepresentations at a later juncture, such as

summary judgment or trial where the issue may be tested against a developed factual record.

The FDIC's next contention is that it had a duty *not* to share its financial condition with

outsiders: "[s]haring insider information could have subjected the [Bank] to significant insider

trader issues and extensive breaches of confidentiality matters."  Mot. at 10.  But this ignores Mr.

Daly's point that one cannot speak in half-truths – *i.e.*, if the senior executives chose to make

affirmative representations about how safe the Bank's business model was, then they could not

omit material information that would qualify those representations.  *See, e.g.*, *Vega v. Jones, Day,

Reavis & Pogue*, 121 Cal. App. 4th 282, 292 (2004) ("[The defendant] specifically undertook to

disclose the transaction and, having done so, is not at liberty to conceal a material term.  Even

where no duty to disclose would otherwise exist, 'where one does speak he must speak the whole

truth to the end that he does not conceal any facts which materially qualify those stated.  One who

is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to

deceive is fraud.'").  Nor does it account for a fraud claim based on omission of material facts

known exclusively by one party, a fact which can provide a basis for a fraud claim even in the absence of a general duty to disclose to the public.  *See Torres v. Adventist Health Sys./W.*, 77 Cal. App. 5th 500, 509 (2022) (noting that there is a duty to disclose where, *e.g.*, "'the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff'").

Finally, the FDIC suggests that the fraud claims are not viable because, if the senior executives at the Bank should have known that the Bank was about to fail, then so should have Mr. Daly who "claims to be a sophisticated, well-connected member" in the industry.  Mot. at 8. The FDIC adds that the Bank's failure should "hardly [have been] a surprise given the multiple failures of . . . other regional banks that caused huge financial turmoil in Silicon Valley."  Mot. at 8 & n.2 (citing Wall Street Journal article).  While these defenses could be asserted on the merits at a later juncture, that is not a reason to dismiss at 12(b)(6); the FDIC has simply raised a question of fact that cannot be resolved at this early juncture in the proceedings if reasonable inferences are drawn in Mr. Daly's favor.  This is especially true given that no matter what information was publicly available, presumably, senior executives as insiders may well have had more non-public information at their disposal about what was going on at the Bank.

Accordingly, the Court rejects the FDIC's arguments in favor of dismissal of the fraud and related claims.

### 3.   Interference Claims

In addition to the fraud claims, Mr. Daly brings interference claims – specifically, claims for intentional interference with prospective economic advantage, negligent interference with the same, and violation of § 17200 based on the same.

The elements of a claim for intentional interference are as follows:

> (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship[;] . . . .
>
> . . . (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

*Golden Eagle Land Invest., L.P. v. Rancho Santa Fe Assn.*, 19 Cal. App. 5th 399, 429 (2018)

(internal quotation marks omitted).

As for the elements of a claim for negligent interference, they are:

> (1) an economic relationship existed between the plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to plaintiff; (2) the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the defendant was negligent; and (4) such negligence caused damage to plaintiff in that the relationship was actually interfered with or disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship.

*Venhaus v. Shultz*, 155 Cal. App. 4th 1072, 1078 (2007) (internal quotation marks omitted).

a.    Intentional Interference

In the instant case, the basic factual predicate for Mr. Daly's interference claims is that the Bank knew Mr. Daly had relationships with his customers that "likely would have led to future economic benefits to [him]," and that "[t]he Bank knew or should have known that [the] relationship[s] would be disrupted if the Bank failed, and/or if the Bank failed to perform other promises made to [him] in connection with [his] employment at the Bank." Compl. ¶ 60.

The claim for intentional interference is problematic in that a viable claim requires "intentional acts on the part of the defendant *designed* to disrupt the relationship[s]." *Golden Eagle*, 19 Cal. App. 5th at 429 (internal quotation marks omitted; emphasis added); *see also Crown Imports, LLC v. Superior Ct.*, 223 Cal. App. 4th 1395, 1404 n.10 (2014) (stating that "[t]he difference between intentional interference and negligent interference . . . relates to the defendant's intent"); *accord Alston v. Aetna Life Ins. Co.*, No. C-93-20291-RMW (EAI), 1994 U.S. Dist. LEXIS 6739, at *23 (N.D. Cal. Feb. 14, 1994) (stating that "[t]he difference is that to be liable for negligent interference the defendant need not have intentionally disrupted an economic relationship, but the disruption must have been reasonably foreseeable"); *Santa Fe Props. v. Source Bioscience*, No. CV 20-10727-JFW(PVCx), 2021 U.S. Dist. LEXIS 245976, at *6 (C.D. Cal. Feb. 10, 2021) (stating that "[a] claim for negligent interference with prospective economic advantage has the same elements as an intentional interference claim except that, instead of an

intentional act, the third element requires that the defendant had knowledge that the relationship would be disrupted if the defendant failed to act with reasonable care and that the defendant failed to act with reasonable care"). Here, there are no concrete facts suggesting that the Bank intended to disrupt the relationships that Mr. Daly had with his customers, and that its action was so designed. Based on the allegations, no reasonable inference of such a purpose can be drawn.

> ### b.     Negligent Interference

As for the claim for negligent interference, the FDIC suggests that Mr. Daly has failed to sufficiently identify a prospective economic advantage. In his complaint, Mr. Daly identifies two prospective economic advantages:

> 17.     For example, Mr. Daly presented the Bank with a customer who was interested in a $95 million loan. During his recruitment, the Bank had represented to Mr. Daly that the Bank was interested in funding the loan and would be ultra-competitive in winning the business, when it knew it would not be competitive. Once Mr. Daly joined, the Bank said that it was no longer funding "large loans."

> 18.     Similarly, the Bank represented that it had competitive home mortgage rates and it would be aggressive in winning any mortgage business he could bring. Once Mr. Daly joined, he brought a potential $18 million mortgage to the Bank. The Bank was not interested and quoted the client a mortgage rate 300 bps higher than the market rate.

Compl. ¶¶ 17-18. The prospective economic advantage in ¶ 17 is adequately identified; moreover, there is a clear allegation that the Bank knew about the prospective economic advantage, *i.e.*, based on communications during the time it recruited him. *See Venhaus*, 155 Cal. App. 4th at 1078 (stating that one element of a claim for negligent interference is that "the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship"). The prospective economic advantage in ¶ 18 is also adequately identified. However, here, it is not clear whether the Bank knew about the possible $18 million mortgage in advance. Thus, without more, no reasonable inference of knowledge can be drawn based on the bare allegations of the complaint.

United States District Court
Northern District of California

c.      Summary

Accordingly, the Court dismisses the claim for intentional interference, but with leave to amend.  The Court dismisses in part the claim for negligent interference (*i.e.*, to the extent the claim is predicated on the prospective economic advantage identified in ¶ 18 of the complaint).  Mr. Daly has leave to amend here as well.

4.      Punitive Damages

The FDIC argues that, to the extent any tort claims survive, Mr. Daly cannot seek punitive damages against it.  In support, the agency cites 12 U.S.C. § 1825(b)(3), which provides in relevant part that, "[w]hen acting as a receiver, the following provisions shall apply with respect to the [FDIC]: . . . the Corporation shall not be liable for any amounts in the nature of penalties or fines."  12 U.S.C. § 1825(b)(3).  The FDIC also cites to *Monrad v. FDIC*, 62 F.3d 1169 (9th Cir. 1995).  There, the Ninth Circuit rejected a district court's award of late payment penalties, based on state law, against the FDIC; the court took note of § 1825(b)(3) and then added that "relevant case law suggests that claims that are punitive in nature under state law cannot be asserted against the FDIC, because the deterrent effect is minimal and other innocent creditors would be punished by diminishing available assets."  *Id.* at 1175; *see also Poku v. FDIC*, No. RDB-08-1198, 2011 U.S. Dist. LEXIS 45679, at *9-10 (D. Md. Apr. 27, 2011) (holding that, because punitive damages "represent penalties, the plain language of Section 1825(b) precludes the imposition of punitive damages on the FDIC"; furthermore, "a punitive damage award will achieve little in the way of deterring the failed WAMU Bank from violating its obligations to its customers" and "a large punitive damage award might substantially diminish the assets available to distribute among creditors of the bank"); *King v. Long Beach Mortg. Co.*, 672 F. Supp. 2d 238, 246 (D. Mass. 2009) (stating that, "[e]ven if this Court were inclined to impose punitive damages or fines, the [Federal Deposit Insurance Act] provides the FDIC with a complete defense" which is "found in 12 U.S.C. § 1825(b)(3)"); *Cassese v. Wash. Mut., Inc.*, 711 F. Supp. 2d 261, 272 (E.D.N.Y. 2010) (stating that "[§] 1825(b) may permit claims against the FDIC for punitive damages that were assessed against a bank prior to its failure" – but not for penalties "assessed after the receivership commences") (emphasis omitted).

United States District Court
Northern District of California

1      In response, Mr. Daly "concedes that the authorities in this jurisdiction have held that [the

2  FDIC] is not subject to punitive damages [but] other jurisdictions disagree."  Opp'n at 22; *see also*

3  *Bradford v. Am. Fed. Bank, F.S.B.*, 783 F. Supp. 283, 285-86 (N.D. Tex. 1991) (rejecting FDIC's

4  argument that it is immune to state law claims for, *e.g.*, punitive damages; "[w]hen acting in

5  receivership capacity, state law governs, and defenses that the FDIC could use in their corporate

6  capacity are unavailable to them").  The Texas court, however, did not address § 1825(b)(3), nor

7  the Ninth Circuit's reasoning in *Monrad*.

8      Accordingly, the Court grants the FDIC's request to dismiss/strike punitive damages.  The

9  Court acknowledges Mr. Daly's statement that he has simply "pleaded punitive damages to

10  preserve the issue for appeal even if this Court is inclined to strike the request."  Opp'n at 23.  No

11  leave to amend is given.

12  D.      New Argument Raised in Reply

13      As a final note, the Court recognizes that the FDIC has raised a new argument in its reply

14  brief.  Specifically, the FDIC refers to the statute 12 U.S.C. § 1821(j).  Section 1821(j) provides as

15  follows: "Except as provided in this section, no court may take any action, except at the request of

16  the Board of Directors by regulation or order, to restrain or affect the exercise of powers or

17  functions of the [FDIC] as a conservator or a receiver."  12 U.S.C. § 1821(j).  Because this

18  argument was not raised until the reply, the Court does not consider it at this time.

19                               **III.      CONCLUSION**

20      For the foregoing reasons, the FDIC's motion to dismiss is granted in part and denied in

21  part.  The motion is granted only as to (1) the claim for intentional interference; (2) the claim for

22  negligent interference predicated on the prospective economic advantage identified in ¶ 18 of the

23  complaint; and (3) the claim for punitive damages.  Mr. Daly has leave to amend on (1) and (2).

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1    The amended complaint shall be filed by October 15, 2024.  The FDIC shall then have

2   until November 12, 2024, to file a response.

3    This order disposes of Docket No. 36.

4

5    **IT IS SO ORDERED**.

6

7   Dated: September 17, 2024

8

9   _____

10   EDWARD M. CHEN
     United States District Judge